UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

WINONA BROWN, o/b/o T.S.,

                          Plaintiff,

                -against-

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

------------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/27/2016

15-cv-06685 (SN)

**OPINION AND ORDER**

       The plaintiff Winona Brown, on behalf of her minor son, T.S., brings this action pro se pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security denying Brown's application for T.S. to receive disability benefits. The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

       Because I conclude that substantial evidence supports the Commissioner's final determination, and because the administrative law judge did not commit legal error justifying remand, the Commissioner's motion is GRANTED.

## PROCEDURAL BACKGROUND

       On October 5, 2012, the plaintiff Winona Brown filed an application for Supplemental Security Income ("SSI") with the Social Security Administration (the "SSA") on behalf of her twelve-year-old son, T.S., who allegedly became disabled under the Social Security Act on September 1, 2008, due to Attention Deficit Hyperactivity Disorder ("ADHD"), disruptive behavior disorder, not otherwise specified (NOS), and a reading disorder. On January 17, 2013,

the Commissioner denied the application, and on March 4, 2013, Brown requested a review of the Commissioner's decision at a hearing before an administrative law judge. Brown and T.S. appeared with counsel for a hearing before Administrative Law Judge Mark Solomon (the "ALJ") on June 17, 2014. The ALJ denied Brown's application for disability benefits in a written decision dated July 30, 2014. The Appeals Council denied Brown's application for review of the ALJ's decision on July 6, 2015, thereby rendering the decision of the Commissioner final.

On August 24, 2015, Brown, proceeding pro se, filed this action on behalf of T.S. pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), before the Honorable Lorna G. Schofield. On December 8, 2015, the parties consented to my jurisdiction. On December 10, 2015, the Commissioner filed the administrative record and a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. The Court sua sponte extended Brown's time to oppose the motion to January 29, 2016, but she did not do so.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

## I.    Non-Medical Records

### A.    Written Statements and Testimony

T.S. was born on August 13, 2000. He was 12 years old at the time of his application and 13 years old at the time of the ALJ's decision. He lived with his mother and two older siblings. At the time of the hearing before the ALJ, his uncle also temporarily resided with the family.

In a November 26, 2012 SSA questionnaire, Brown reported that T.S. exhibited some behavioral issues at home and at school. She wrote that he angered easily if he lost a game and that he "ha[d] an attitude." (AR 176.) She stated that T.S. had "minor discipline issues" at

school, and was once on "superintendents suspension." Id. Brown noted that T.S. often had difficulty verbally articulating his thoughts. She wrote that since starting Concerta to treat symptoms of his ADHD, T.S.'s focus and grades had improved.

At the June 17, 2014 hearing before the ALJ, Brown testified that T.S.'s anxiety and grades had improved since taking Concerta.  (AR 38.) She said that his school had developed an Individualized Education Program (IEP) and that T.S. attended special ratio classes to help him focus on his lessons. Brown stated that T.S.'s teachers reported that he was occasionally "chatty" and "fidgety," but that she was not aware of any specific behavioral issues at school. (AR. 40.) She said that T.S. was "very focused and attentive" in the mornings, but by later in the afternoon, his ADHD medication began to wear off and he sometimes experienced difficulty concentrating. Id. Brown stated that T.S. was receiving passing grades and planned to attend Urban Technology High School in the fall.

Brown testified that T.S. experienced difficulty expressing his feelings and frustrations, and often bottled up his emotions and then later released them as rage. She said that he often expressed his anger by slamming doors and walking away to be by himself. Brown was not aware of T.S. engaging in any physical confrontations at school or with his siblings. She said that she had never seen T.S. harm himself.

Brown testified that T.S. attended therapy once a week at the Family Children Institute at St. Luke's Hospital. She said that therapy was also available to him at school, if he needed additional support. She said that T.S. met with a psychiatrist once a month to monitor his ADHD mediation.

Brown testified that T.S. rode the train to and from school every day by himself. She said that she often had to "fight with him" to do his homework, but that he always completed his

assignments. (AR 41.) Brown stated that T.S. normally attended the after-school program at
Harlem Children's Zone, but that he recently had been attending a two-week "credit recovery"
program for students who needed to improve their grades in order to graduate from the eighth
grade. Brown stated that during the summer, T.S. planned to attend a summer program at Harlem
Children's Zone as a part-time camper and part-time worker.

      T.S. testified that he had a group of friends at school. He said that in his free time, he
enjoyed playing basketball, football and video games. T.S. stated that his grades over the past
year had been "not so good," but added that he thought he would do better. (AR 50.) He said that
his best grades were in math, science, and physical education, and that his grades in social
studies fluctuated. T.S. testified that he sometimes needed more time than his peers to process
and understand something he had just read, but that he usually was able to understand material
that was written at his reading level. He said that when writing, he sometimes had an idea in his
head that he found difficult to write down.

### B.    School Records

      On May 15 and 16, 2012, T.S. underwent a Psychoeducational Evaluation at his school.
He was referred for a special education evaluation by his mother, who was concerned about his
academic progress. The report noted that T.S. had failed to meet the standards for
English/Language Arts ("ELA") and math on his past state exams. On a recent report card, T.S.
had received failing grades in ELA, math, social studies and science. The evaluator noted that
T.S. was a "cooperative and engaging student." (AR 195.) T.S.'s IQ score was measured at 90,
which corresponded to the 25th percentile. His reasoning abilities were judged to be age-
appropriate, but his IQ score was brought down by his below-average score on measures in
processing speed, which were in the 7th percentile. His verbal comprehension index was in the

lower end of the average range, and he scored in the 9th percentile on a reading comprehension test. When asked to write an essay recalling major events discussed earlier in a story, T.S. omitted several major events and often wrote in incomplete sentence fragments; his score was in the 9th percentile. T.S.'s working and long-term memory were judged to be unimpaired, and he scored within the average range on two math assessment tests.

    The evaluator concluded that T.S. displayed "significantly delayed" mental processing and average to low-average verbal reasoning skills. (AR 198.) He recommended a more thorough evaluation of T.S.'s language development by a speech/language pathologist. The evaluator also noted that T.S. appeared to experience attention problems and wrote that "these difficulties, paired with relatively weak verbal abilities, language development and vocabulary, could account for his trouble with reading and writing." (AR 200.)

    In a Speech/Language Evaluation dated June 27, 2012, T.S.'s teacher, Ms. Nott, reported that he had difficulties with reading and comprehending higher-level skills. She stated that he was a hard worker and had a good attitude toward learning, but placed him in the middle-bottom one-third of her class. Other teachers also reported that T.S. had difficulty remaining on task, and often socialized with his friends. The speech/language evaluation examiner found that T.S.'s "core language skills were found to be grossly intact delayed," with "severe delays" noted in his ability to recall information. (AR 203.) The evaluator also noted "severe delays" in one area of language functioning, which he wrote were "imperative, severe and crucial" to T.S.'s ability to succeed academically. Id. The evaluator strongly recommended intervention by a speech-language pathologist.

    An IEP dated September 21, 2012, placed T.S.'s reading comprehension and reading fluency in the 9th percentile. It described his processing speed as "slowed" and stated that he

5

"performed poorer than approximately 91-93% of children his age on oral tasks that required rapid retrieval of information from long-term memory (RAN) and timed visual motor tasks." (AR 145.) The IEP also noted that T.S. experienced attention problems and possessed "relatively weak verbal abilities, language development and vocabulary." Id. T.S.'s reasoning abilities, math skills and working memory were all described as "age appropriate" and "within normal limits." Id. T.S.'s teachers gave positive feedback regarding his social and physical development, noting that he was a "warm and friendly boy who relates well with peers and adults." (AR 146.)

In order to accommodate T.S.'s slow processing speed, the IEP recommended that his teachers preview unfamiliar vocabulary with him and give slow and simplified instructions for assignments. The IEP stated that T.S. frequently needed to read books at his grade-level and develop more active reading habits. The IEP also recommended daily remedial reading support and routine instruction to improve his writing. T.S. was placed in integrated co-teaching classes for math and ELA. He was also enrolled in a speech-language therapy class that met twice a week. His teachers were directed to give him time and a half for all tests, and to place him in a separate room to minimize distractions from other students.

On March 11, 2013, T.S.'s 7th grade teachers Linda Dershowitz and Linda JeanMary jointly completed an SSA questionnaire. They reported that he read at a 5th grade level and was capable of completing math problems at a 6th grade level. In an assessment of T.S.'s abilities to acquire and use information, they rated his level of impairment as "a very serious problem" in the area of "expressing ideas in written form," and rated his level of impairment as a "serious problem" in the following areas: comprehending oral instructions, reading and comprehending written material, and providing organized oral explanations and adequate descriptions. (AR 259.) T.S. had "obvious problem[s]" in the areas of understanding school and content vocabulary,

comprehending and doing math problems, understanding and participating in class discussions, learning new material, and applying problem-solving skills in class discussions. Id.

Ms. Dershowitz and Ms. JeanMary reported that T.S. processed information slowly and had difficulty retrieving information on the spot or to discuss in class. They wrote that he completed more work in math and science, "where information is more logical to him," than in ELA and Social Studies, where he routinely was expected to complete more written assignments. Id. They stated that T.S. acted "annoyed" if a teacher offered to help him in class, and noted that even with help he rarely completed writing assignments on time. Id.

Regarding T.S.'s ability to attend and complete tasks, his teachers reported that he frequently had "serious problem[s]" focusing long enough to finish an assigned activity, refocusing to task when necessary, completing class or homework assignments, working without distracting himself or others, and working at a reasonable pace or finishing assignments on time. (AR 260.) They also reported problems under the domain of interacting and relating with others, noting "serious problem[s]" in the areas of seeking attention appropriately, expressing anger appropriately, following rules, and respecting/obeying adults in authority. Id. They noted, however, that he did not require a behavior plan because "his issues are attentional and language based." (AR 261.)

Under the domain of caring for himself, Ms. Dershowitz and Ms. JeanMary reported that T.S. had "serious problem[s]" with handling frustration appropriately, using appropriate coping skills to meet daily demands of the school environment, and knowing when to ask for help. They wrote that he became "excited, finicky and reacts physically." (AR 263). They also reported that

he needed reminders to focus on his class assignments, and did not independently ask his teachers for help with his work.

T.S.'s teachers noted that he became "much more focused" and "happy" after starting Concerta. (AR 264.) They reported that without the medication, he was "angry, defiant, and unable to participate effectively." Id. They wrote that T.S.'s "distractibility affects him greatly," but observed that he had been more productive since he began attending speech and language therapy twice a week and receiving additional in-class support through small group or one-on-one tutoring. Id.

### C.   Gemma Burgio, MPS Art Therapist

In April 2012, T.S. began regularly meeting with Gemma Burgio, MPS Art Therapist at the Child and Family Institute Outpatient Department of St. Luke's Child and Family Institute. Ms. Burgio noted that T.S. had Axis I diagnoses of ADHD-I, disruptive behavior disorder NOS, and reading disorder, and a Global Assessment Functioning ("GAF") score of 55.[1] (AR 226.) In a treatment plan dated April 23, 2012, Ms. Burgio wrote that the goal of the art therapy sessions was to "identify stressors that may be cause of increased anger and decline in academic functioning, learn skills in order to manage anger and improve academic success." (AR. 453.)

In her treatment notes from October 20, 2012, Ms. Burgio noted that T.S. had been prescribed 18 mg of Concerta daily. She wrote that he was scheduled to be moved to group

---

[1] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. rev. 2000) ("DSM-IV")). A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupations, or school functioning (e.g., few friends, conflicts with peers of co-workers.)." DSM-IV 34. The Fifth Edition of the DSM has discarded the use of GAF Scores. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-V").

therapy with other adolescent boys, but that he would continue meeting with Ms. Burgio until the transfer occurred.

There is a gap in treatment notes from October 2012 until January 2013, when T.S. stopped attending therapy sessions at St. Luke's and instead went to an afterschool program. At his next visit with Ms. Burgio, on January 18, 2013, she noted that his mother wanted him to re-enroll him in individual or group therapy.

### D.      Victor Gotay, M.Sc.

T.S. began meeting with Mr. Gotay on February 8, 2013, when he attended a family session with his mother. Brown told Mr. Gotay that she felt the Concerta had improved T.S.'s focus. She expressed continued concerns about T.S.'s grades, intermittent low frustration tolerance, and occasional arguing with his brother.

At May 24, 2013 family session, Brown reported that T.S. was doing better in school and earning grades in the 70s. She said that at a recent IEP review, the school decided to enroll T.S. in speech therapy. Brown said that T.S. continued to argue occasionally with his older brother. Mr. Gotay encouraged Brown to provide praise and positive feedback to T.S. when he behaved appropriately at school and to verbalize an understanding of T.S.'s feelings at least three times a week.

In a treatment plan dated October 9, 2013, Mr. Gotay noted that T.S. and his mother reported fair behavior at school, improved attention span, positive medication compliance, sporadic verbal conflict with his siblings, stable peer relations, positive experiences at summer

sleep-away camp, fair adjustment to eighth grade, and a "significant decrease to absence in angry

outbursts." (AR 360.) T.S. expressed ambivalence about attending his after-school program.

On January 16, 2014, Mr. Gotay noted that T.S. reported positive school work

completion and fair attention span at school, which he said could still be improved. T.S. stated

that his Concerta dosage had been increased "due to psychologist Dr. Muhkerjee's

recommendation." (AR 326.) On January 23, 2014, T.S. reported occasional poor class

participation due to shyness and fear that his peers would laugh at him. He reported no bullying

at school, and positive schoolwork completion.

In a treatment plan dated January 27, 2014, Mr. Gotay noted that Dr. Muhkerjee had

performed a neuropsychological evaluation of T.S. on November 6, 2013. The evaluation

revealed a "continued neurocognitive defect in attention skills," "significant difficulties" in

reading skills, a disorder of written expression, and symptoms consistent with anxiety disorder.

(AR 317.) Mr. Gotay discussed with T.S. and Brown the benefits of positive behavior, methods

for maintaining good grades, conflict resolution challenges, and anger management techniques.

At a session on February 20, 2014, T.S. reported an anger score of 3/10 and an anxiety

score of 1/10. Mr. Gotay observed that T.S. was in a "mild angry mood," and T.S. explained that

he recently had a minor argument with a family member. (AR 309.) Mr. Gotay discussed anger

coping skills with T.S., who was responsive to Mr. Gotay's suggestions.

At a family session on February 25, 2014, Brown discussed issues with T.S.'s IEP and

said that she was working with an education lawyer to help her to find the appropriate high

school for T.S. She reported "recurring moderate anger" at home related to restrictions she had placed on T.S.'s access to his video games. (AR 308.)

T.S. brought a copy of his report card to a March 13, 2014 therapy session. His overall average had increased from 66 to 75, and he received two 90's and several 70's. He failed his ELA class. T.S. rated his anxiety level at 6–7/10, and his anger score at 4/10. He said that his anxiety was triggered by his report card and high school acceptance letters, and the anger was connected with minor family arguments. T.S. told Mr. Gotay that he had been accepted to his third choice high school: the High School of Urban Technology. Mr. Gotay explored coping strategies with T.S. and discussed ways to improve his communication with family members.

Throughout April 2014, T.S. reported low anxiety and anger scores. He said that he had experienced some mild anxiety about the ELA state tests, and had a minor argument with his brother. T.S. reported positive schoolwork completion and no bullying by his peers.

In early May 2014, T.S. told Mr. Gotay that he had experienced some elevated anxiety in connection with a math test. On May 8, 2014, he reported an anger score of 6/10 stemming from conflicts with his uncle, who was staying temporarily with T.S.'s family. Mr. Gotay explored coping skills with T.S. and commended him for doing well in school. In late May, T.S. reported low anger and anxiety scores. He told Mr. Gotay that he was graduating from middle school on June 27, and planned to attend Urban Technology High School in the fall.

## II.   Disability Opinions of Treating Physicians

### A.   Dr. Preetika Mukherjee, Ph.D.

Pediatric Neuropsychologist Preetika Mukherjee, Ph.D., conducted a Confidential Neuropsychological Assessment of T.S. on June 28 and 29, 2012. Brown told Dr. Mukherjee that T.S. had exhibited difficulty with attention since the third grade. He was easily distracted and

forgetful, and generally had a low frustration tolerance that was often communicated through temper tantrums. Dr. Mukherjee noted that T.S. had been suspended from school the previous year for making a blow torch outside school premises.

Dr. Mukherjee noted that T.S. was adequately related, fully oriented and cooperative. She wrote that his mood was euthymic and he displayed full range of affect. Dr. Mukherjee did not observe any anxiety or mood symptoms. She found that his linguistic abilities, including speech pace, volume and intonation quality, were within normal limits, but noted some difficulties in sentence structure and usage. Dr. Mukherjee found T.S. to be "persistent," but found that he "exhibited difficulty with maintaining a consistent focus on tasks for sustained periods of time." (AR 212.)

In the neurocognitive evaluation, Dr. Mukherjee noted poor sequencing and visuo-spatial skills. She found that in areas of expressive language, T.S. had word retrieval difficulties. His language processing and comprehension skills were "generally average," although he showed some mild problems with verbal organization. Id. An executive control system test revealed that T.S. had difficulty sustaining attention to one activity over time. His performance was "variable" on other attention-related tasks. (AR 213.) Dr. Mukherjee noted that T.S.'s teachers also reported "significant inattention and hyperactivity." (AR 214.) She found that T.S.'s scores on reading, math and writing tests were below-average.

Dr. Mukherjee concluded that T.S. had ADHD – inattentive type, which was characterized by "being disorganized, easily pulled off course, forgetful and inattentive, making careless mistakes, and not paying close attention to detail, as well as having difficulty organizing work, planning a strategy, and keeping track of multiple things held in mind." Id. She noted that

individuals with this type of slow information processing often have more "internalizing symptoms," like depression and anxiety. Id.

Additionally, Dr. Mukherjee found that T.S. had deficits in expressive language skills, particularly in areas of word retrieval and difficulty with structural language. She wrote that these expressive language deficits had caused corresponding deficits in T.S.'s writing skills.

Dr. Mukherjee found that T.S.'s language-based learning difficulties affected his ability to acquire academic materials in the areas of reading and writing. He exhibited "significant weakness" in reading comprehension, consistent with a DSM-IV diagnosis of reading disorder. Id. She also diagnosed him with disorders of written expression and developmental coordination disorder or dyspraxia.[2]

Dr. Mukherjee recommended a consultation with a psychiatrist for medication management for ADHD, as well as social skills therapy to help T.S. with perception and coping skills. Regarding his learning disorders, Dr. Mukherjee wrote that T.S. should attend speech therapy twice a week, and receive daily reading/writing intervention on an individual basis in order to address his reading comprehension and structural writing problems.

Dr. Mukherjee met with T.S. and Brown for family counseling sessions in November 2013. She noted that they discussed T.S.'s cognitive and academic difficulties, and the relationship between his emotional functioning and academic difficulties. She recommended that he complete a new round of neuropsychological testing in December 2013.

---

[2] Dyspraxia is a disorder "characterized by an impairment in the ability to plan and carry out sensory and motor tasks." Individuals with dyspraxia often appear "out of sync with their environment." Symptoms include poor balance and coordination, clumsiness, vision problems, perception difficulties, emotional and behavioral problems, difficulty with reading, writing and speaking. NINDS Developmental Dyspraxia Information Page, National Institute of Neurological Disorders and Stroke, www.ninds.nih.gov/disorders/dyspraxia/dyspraxia.htm (last visited May 6, 2016).

**B.     Dr. Noam Koenigsberg, M.D.**

On August 30, 2012, Dr. Noam Koenigsberg performed an initial psychiatric evaluation on T.S. Dr. Koenigsberg noted that Dr. Mukherjee had diagnosed T.S. with ADHD, inattentive type, and reading disorder. Brown informed Dr. Koenigsberg that T.S. had anger problems, and recalled an incident when he punched and consequently broke the flat screen TV in their apartment. T.S. told Dr. Koenisberg that he occasionally punched himself in the arm when he felt angry. He also reported that on a few occasions in the past two weeks, he had heard voices in his head telling him to hurt himself. T.S. denied any other symptoms of psychosis.

T.S. told Dr. Koenigsberg that he struggled with reading and writing, but did well in math and science. When asked about the blow torch incident at school, T.S. stated that he did not intend to hurt anyone, but was merely trying to "be cool" and show off for his friends. (AR 436.) In retrospect, he acknowledged that it was a bad idea.

Dr. Koenigsberg assigned T.S. a GAF score of 70. He noted that T.S. was "very calm and cooperative" and appeared to be able to focus and concentrate throughout the interview. (AR 436.)

In a January 2, 2013 report to the New York State Office of Temporary Disability Assistance, Dr. Koenigsberg wrote that he had diagnosed T.S. with ADHD – inattentive type, the symptoms of which included inability to concentrate, distractibility, difficulty following directions and frequently losing things. He wrote that T.S. was taking 18 mg of Concerta daily, which had resulted in improved concentration and better performance in school. Dr. Koenigsberg rated T.S.'s sensory abilities, communication skills and social/emotional skills as "age appropriate" (AR 236, 238.) He rated his cognitive abilities, however, as not age appropriate. Dr.

14

Koenigsberg noted that T.S.'s mood was euthymic with full affect, and characterized his attention and concentration as "fair." (AR 239.)

In treatment notes dated January 4, 2013, Dr. Koenigsberg wrote that T.S. was taking his prescribed dose of Concerta only on school days. T.S. reported that he was concentrating better in school, and his grades and behavior had improved. Dr. Koenigsberg noted that T.S.'s mood was euthymic and his affect was full. He wrote that T.S. was no longer attending therapy, and his only current treatment was through Concerta. Treatment notes indicated a GAF score of 60.

On January 22, 2013, Dr. Koenigsberg reported that T.S. had had three episodes of "acting out in school." (AR 416.) T.S. explained that there had been a substitute teacher at school and other students were misbehaving, which distracted him and caused him also to misbehave. Brown told the doctor that the regular teachers, and not the substitute teacher, had called her to report T.S.'s behavioral issues. Dr. Koenigsberg suggested treating the behavioral issues with a combination of a higher dosage of Concerta to improve T.S.'s concentration, along with group or individual therapy to help him to "deal with his frustration in a more productive manner." (AR 416.) He increased T.S.'s daily Concerta dosage from 18 to 27 mg.

On February 12, 2013, T.S. told Dr. Koenigsberg that was attending counseling sessions with Mr. Gotay, with whom he planned to continue some of the art projects he had worked on with Ms. Burgio. T.S. reported a large increase in his concentration after beginning the higher dosage of Concerta.

Treatment notes from April through June 2013 indicate that T.S. continued to do well on the increased dosage of Concerta. Brown told Dr. Koenigsberg that T.S.'s medication wore off by the end of the school day. After speaking with T.S., however, Dr. Koenigsberg concluded that T.S. found it more difficult to concentrate and remain focused toward the end of each class

period, rather than toward the end of the day. Dr. Koenigsberg noted that T.S. planned to take a drug holiday over the summer. Dr. Koenisberg recommended that T.S. undergo a new psychiatric evaluation over the summer, while he was not taking the Concerta. He noted that after the summer, T.S. would begin meeting with a new psychiatrist.

### C.    Dr. Andrew O'Hagan, M.D.

On July 11, 2013, Dr. Andrew O'Hagan, M.D., became T.S.'s treating psychiatrist. T.S. told Dr. O'Hagan that he sometimes felt bullied by his older siblings, but added that he was currently getting along better with them. When asked about his anger control issues, T.S. reported "vague feelings of helplessness." (AR 380.) Dr. O'Hagan wrote that T.S.'s remote memory was grossly intact, with "some mild impairment on attention and concentration testing." Id. Overall, he noted that T.S. was "pleasant, well related, [and] exhibiting age appropriate behavior." Id. Dr. O'Hagan planned to see T.S. in late August to prescribe medication for the new school year.

On September 3, 2013, Dr. O'Hagan met with T.S. to refill his Concerta prescription. T.S. told Dr. O'Hagan that he had "a pretty good" summer at camp, but was not sure how he felt about returning to school. (AR 370.) T.S. said that he was looking forward to seeing his friends again. He denied having any issues with his temper, or fighting with his mother or siblings. Dr. O'Hagan started T.S. on 18 mg Concerta, with a planned follow-up visit in two weeks. On October 8, 2013, Dr. O'Hagan increased T.S.'s dosage to 27 mg.

At a November 12, 2013 appointment, Brown told Dr. O'Hagan that there were no behavioral issues at home or school. She said that she expected T.S. to earn poor grades that quarter, and expressed doubt that T.S.'s school was providing him with the sufficient support in compliance with his IEP. Brown stated that she noticed "some degree of moodiness and anxiety"

related to school, which T.S. denied. (AR 341.) Dr. O'Hagan ran a "scared assessment" and

found that T.S. scored subthreshold for all anxiety disorders. Id. He increased T.S.'s dosage of

Concerta to 35 mg.

On December 12, 2013, Dr. O'Hagan noted that T.S. was "better engaged" and displayed

"more spontaneous" speech and a "concrete" thought process. (AR 334.) T.S. and Brown both

reported increased ability to complete homework and pay attention in class.

On January 16, 2014, T.S. and Brown reported that T.S. continued to struggle

academically. Brown was eager to address changes in his IEP with the school's attorney. T.S.

said that he could focus easier, but reported difficulty with making a schedule. He said that he

continued to grow very anxious when asked to do tasks publicly in the classroom. Dr. O'Hagan

increased T.S.'s Concerta dosage to 54 mg per day.

At his next appointment on February 20, 2014, T.S. reported that his school-related

anxiety had improved with therapy and medications. His mother stated that he was "doing well,

had a few better grades, but we are waiting on his report card." (AR 314.)

On March 20, 2014, Dr. O'Hagan noted that T.S. appeared to be doing well and had

improved grades in all subjects except ELA.

On May 8, 2014, Dr. O'Hagan noted that Brown informed him that T.S. was doing better

in school. He wrote that T.S. denied any psychiatric symptoms, other than some mild anxiety in

the classroom.

### III.    Disability Opinions of Consulting Physicians

#### A.    Dr. Michael Kushner, Ph.D.

Dr. Michael Kushner, Ph.D., conducted a consultative psychiatric evaluation of T.S. on

December 31, 2012. He noted that T.S. was in the seventh grade, enrolled in his first year of

17

special education classes, and also received speech therapy at school. T.S. told Dr. Kushner that

he saw Dr. Koenigsberg once a month and Ms. Burgio once a week. Dr. Kushner noted that T.S.

was currently taking 18 mg of Concerta once a day.

Dr. Kushner found that T.S.'s demeanor and responsiveness were cooperative, and that

his manner of relating and social skills were age appropriate. He noted that T.S.'s attention and

concentration were intact, and that his recent and remote memory skills were intact and age

appropriate. Dr. Kushner wrote that with regard to daily functioning, T.S.'s ability to attend to,

follow and understand age-appropriate instructions might be somewhat impaired due to this

attention problems. Dr. Kushner diagnosed T.S. with attention deficit disorder, and concluded

that "the results of the evaluation appear to be consistent with cognitive problems, but in itself,

this does not appear to be significant enough to interfere with the claimant's ability to function

on a daily basis." (AR 231.)

### B.    Dr. J. Randall, M.D.

On January 15, 2013, State Agency pediatric consultant Dr. J. Randall, M.D., completed

a consultative evaluation in which he determined that T.S. was not disabled. After finding that

T.S.'s sole "severe impairment" was ADHD, Dr. Randall concluded that his symptoms did not

meet, medically equal, or functionally equal, the requirements for a Listing disorder under 20

C.F.R. Pt. 404, Subpt. P, App. 1 §112.11. In assessing T.S.'s functioning in each of the six

domains on the childhood disability evaluation, Dr. Randall found that T.S. had no limitations in

the domains of moving about and manipulation of objects, caring for yourself, and health and

physical well-being. In the domain of acquiring and using information, Dr. Randall concluded

that T.S. had "less than marked" limitations, associated with his slowed processing speed. Dr.

Randall found that T.S. had "average" cognitive functioning, and described his thought process

as "coherent and goal directed." (AR 69.) He likewise characterized T.S.'s limitations in the

domain of attending and completing tasks as "less than marked," noting that his medical reports

showed "good response to medication." Id. In support of this finding, he noted that Dr. Kushner

had found that T.S.'s ability to attend, follow, understand and complete instructions may be

"somewhat impaired," and that his teachers reported that he was "somewhat distractible in

class." Id. Lastly, Dr. Randall concluded that T.S. had "less than marked" limitations in the

domain of interacting and relating with others, nothing that his "manner of relating and social

skills are age appropriate," he "relates well with peers and adults," and was "responsive to

teacher directives/instructions." Id.

Dr. Randall found that the objective medical evidence substantiated T.S.'s statements

about the intensity, persistence and functionally limiting effects of his symptoms. He also found

that there were no medical sources or other opinions regarding T.S.'s limitations or restrictions

that were more restrictive than his own findings.

### C.    Dr. Matilda B. Brust, M.D.

In anticipation of the hearing before the ALJ, Dr. Brust submitted a short report with a

summary of T.S.'s medical records and social history, as well as a short description of her own

conclusions. She wrote that T.S.'s "main problem is his difficulty in processing information."

(AR 461.) She noted that his scores fell into the "borderline range" for processing speed,

indicating that it was "very difficult for him to thrive in a general education environment." (AR

461.) Dr. Brust considered the Listings requirements for cognitive delays (20 C.F.R. Pt. 404,

Subpt. P, App. 1 § 112.05), expressive language delays (no listing), and ADHD (20 C.F.R. Pt.

404, Subpt. P, App. 1 § 112.11), and determined that T.S. did not meet or medically equal any

Listings. She found that he functionally had a "marked limitation" in acquiring and using

information, and a "less than marked" limitation in attending and completing tasks. (AR 461.) Other domains were not affected.

At the hearing, Dr. Brust testified that T.S. had a deficit in processing speed, ADHD, and an anxiety disorder. She opined that T.S.'s processing speed impairment was "the core of his problems." (AR 57.). Dr. Brust concluded that the symptoms of T.S.'s ADHD, anxiety and slow processing speed, when considered in combination, "borderline" met or medically equaled the Listings criteria for anxiety and ADHD. (AR 56.) In response, the ALJ asked Dr. Brust whether, in light of T.S.'s improvements over the past year and a half, he currently had a condition that met or medically equaled the Listings. Dr. Brust responded that with medication and appropriate schooling, T.S.'s symptoms did not meet or medically equal the Listings' requirements. The ALJ then asked whether at any time between November 6, 2012, and the date of the hearing, there was a 12-month period during which T.S. may have met or equaled the Listings. Dr. Brust responded that there may have been a period in or around 2012 when he met or medically equaled the Listings, but added that because she did not know the exact date on which T.S.'s symptoms began to improve, she could not definitively answer the ALJ's question.

The ALJ then asked Dr. Brust to describe T.S.'s levels of limitation within each of the six functional equivalence domains. In the domain of acquiring and using information, Dr. Brust testified that T.S. has "less than marked limitation, based on his academic delays associated with his processing speed." (AR 58–59.) In the domain of attending and completing tasks, Dr. Brust described T.S.'s limitations as "less than marked because of ADHD." (AR 59.) She also assigned less than marked limitations to the domain of health and physical well-being because T.S. was prescribed medication to treat his ADHD. In the three remaining domains of moving about and

20

manipulation objects, caring for self, and interacting and relating with others, Dr. Brust testified that T.S. had no limitations.

When pressed by T.S.'s counsel to explain her conclusions regarding his limitations in the domains of acquiring and using information and attending and completing tasks, Dr. Brust stated "there's no way you can put it at a marked" because T.S.'s processing speed impairment was "not affecting him that much." (AR 61.) Dr. Brust pointed to the fact that T.S. was currently passing all of this classes and suggested that in order to improve his ability to process new materials, he should do his homework assignments aloud. As a follow-up question, T.S.'s attorney asked Dr. Brust whether she would have described T.S.'s limitations as "marked" in 2012, when he was not passing some of his classes. Dr. Brust answered that assuming T.S. was not passing all of his classes at the time, he would have had marked limitations in both domains.

## DISCUSSION

### I.    Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995) (*per curiam*). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial

evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Comm'r of Soc. Sec'y, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and quotation marks omitted; emphasis in original)).

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) ("Cruz I")). "The Act must be liberally applied, for it is a remedial statute intended to include not exclude." Cruz I, 912 F.2d at 11.

Though generally entitled to deference, an ALJ's disability determination must be reversed or remanded if it is not supported by "substantial evidence" or contains legal error. See Rosa, 168 F.3d at 77. Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y.

Aug. 21, 2012) ("Rivera I") (citation omitted). Without doing so, the ALJ deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

When, as here, the Court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is a sufficient basis for granting the motion. See Wellington v. Astrue, 12 Civ. 03523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); Martell v. Astrue, 09 Civ. 01701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) (same); cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

Pro se litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see also Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal pro se standard in reviewing denial of disability benefits).

II.      **Definition of Childhood Disability**

Under the Act, a child, defined as someone under the age of 18, is considered disabled if

the child "has a medically determinable physical or mental impairment, which results in marked

and severe functional limitations, and which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

1382c(a)(3)(C)(i). To determine whether a child claimant qualifies for SSI, the ALJ must

conduct a three-step inquiry. See Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004). The steps

are followed in order: if it is determined that the claimant is not disabled at a step of the

evaluation process, the evaluation will not progress to the next step. At step one, the ALJ must

determine that the claimant is not engaged in any "substantial gainful activity." 20 C.F.R. §

416.924(b) ("If you are working and the work you are doing is substantial gainful activity, we

will find that you are not disabled regardless of your medical condition or age, education, or

work experience."). At step two, the ALJ must find that the child has a medically determinable

severe impairment, i.e., an impairment or combination of impairments "that causes . . . more than

minimal functional limitations." Id. § 416.924(c). At step three, in order to find that a child is

disabled under the Act, the ALJ must find that an impairment or combination of impairments

"meet[s], medically equal[s], or functionally equal[s] the [L]istings." Id. § 416.924(d). A Listing

is met when the impairment satisfies all the criteria contained in the Listing. Id. § 416.924(d). An

impairment medically equals a Listing "if it is at least equal in severity and duration to the

criteria of any listed impairment." Id. § 416.926(a).

If a claimant's impairments do not meet or medically equal any of the listings, the ALJ

must determine whether they functionally equal a Listing. Impairments functionally equal a

Listing where they result in "marked" limitations in two of the six domains of functioning or an

"extreme" limitation in one of the six domains. Id. § 416.926a(a). The six functional domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Id. §§ 416.926a(b)(1)(i)–(vi). Limitations will be considered "marked" when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(2)(i). A marked limitation "is the equivalent of the functioning [the ALJ] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id. For the sixth functional domain, "health and physical well-being," the ALJ will find a marked limitation where the child's impairments cause frequent illness or where the child has "frequent exacerbations of . . . impairment(s) that result in significant, documented symptoms or signs." Id. § 416.926a(e)(2)(iv). An "extreme" limitation is one that is "more than marked;" it "is the rating [the SSA] give[s] to the worst limitations," such as those demonstrated by "standardized testing . . . scores that are at least three standard deviations below the mean." Id. § 416.926a(e)(3)(i).

To be eligible for SSI benefits, the ALJ must also find that the child's impairment satisfies the twelve-month duration requirement, which can be any period of time from the date that the claimant filed his application until the date of the ALJ's decision. See 20 CFR § 416.330.

## III.    The ALJ's Determination

On July 30, 2014, after evaluating T.S.'s claims pursuant to the three-step sequence, the ALJ issued a decision finding that T.S. was not disabled within the meaning of the Act since October 5, 2012, the date his application was filed. The ALJ found at step one that T.S. had not engaged in substantial gainful activity since October 5, 2012. At step two, the ALJ found that T.S. had the following severe impairments: ADHD, an anxiety disorder and a learning disorder.

25

At step three, the ALJ found that T.S. did not have impairments that, alone or in combination, met or medically equaled one of the impairments in the Listings. To determine whether T.S.'s impairments functionally equaled a Listing, the ALJ analyzed each of the six domains of functioning. He concluded that T.S.'s impairments did not result in either "marked" limitations in any two domains, or "extreme" limitation in any one domain. Accordingly, he found that T.S. was not disabled under the Act and thus not eligible for SSI benefits.

The ALJ found that Brown's statements concerning the intensity, persistence and limiting effects of T.S.'s impairments and symptoms were not supported by objective evidence and therefore not credible in establishing that T.S. is disabled under the applicable guidelines.

He discussed at length Dr. Brust's findings and conclusions. He gave "substantial weight" to her findings regarding T.S.'s functional limitations, noting that they were consistent with the treatment notes in the record, other examination findings and T.S.'s current level of functioning. (AR 20.) The ALJ reviewed Dr. Brust's findings for each of the six functional domains set forth in 20 C.F.R. §§ 416.926a. Under "acquiring and using information," Dr. Brust concluded that T.S. had less than marked limitations, based primarily on academic delays associated with his processing speed. (AR 16.) In the domain of attending and completing tasks, she found that he had a less than marked limitation due to his ADHD and processing speed. Dr. Brust found no limitations related to interacting and relating with others, moving or manipulating objects, and caring for himself. She concluded that T.S. had less than marked limitations in health and physical well-being "as a result of improvement in his ADHD due to medication." (AR 20.) Based on these findings, the ALJ concluded that T.S. did not have "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning.

The ALJ only assigned "partial weight" to Dr. Brust's hearing testimony that T.S.'s impairments may have equaled the Listings, noting that Dr. Brust admitted that she was unaware of when T.S.'s symptoms began to improve. (AR 20.) The ALJ noted that Drs. Kushner and Randall both concluded that no Listings-level disorder was met and found that no marked limitations had persisted past January 2013.

The ALJ gave "partial weight" to Dr. Kushner's findings in December 2012 that T.S. had some degree of cognitive problems secondary to ADHD, including "somewhat impaired" abilities to attend to, follow and understand age-appropriate directions and complete age-appropriate tasks. (AR 22.) The ALJ concluded that although Dr. Kushner's findings were consistent with other evidence in the record, they were based on only one exam and failed to fully address any of the "critical domains." Id. In support of this conclusion, the ALJ cited Dr. Koenigsberg's January 2, 2013 report, in which he noted that T.S.'s sensory abilities, emotion and communication skills were age-appropriate. Although Dr. Koenigsberg had found that T.S.'s cognitive skills were "not yet up to the age-appropriate level," the ALJ noted that T.S.'s concentration had improved on Concerta. He concluded that Dr. Koenigsberg's report "indicates the absence of any marked limitations." Id.

Additionally, the ALJ examined T.S.'s school records and performance evaluations from his teachers. He noted that his September 2012 IEP reported "continuing processing speed delays and attention problems" with reading fluency and written expression "below grade level at the ninth percentile." (AR 22.) In a questionnaire completed in March 2013, T.S.'s seventh grade teachers marked his functioning in the category of Acquiring and Using Information as presenting "obvious problems to very serious problems." (AR 22–23.) The ALJ noted, however, that the 2013 report reflected overall "far less impaired" functioning in the areas of Attending

27

and Completing Tasks, Interacting and Relating to Others, as well as "few or no limitations" in Moving About/Manipulating and Self-Care. (AR 23.) The ALJ also concluded that recent teacher evaluations reflected "significant recent improvements, even in the most problematic areas." Id.

Lastly, the ALJ considered treatment notes from T.S.'s regular psychiatric evaluations and outpatient treatment notes from St. Luke's Hospital. He referenced Dr. Mukherjee's findings in June 2012 that T.S. experienced difficulty concentrating and focusing and was easily pulled off task, forgetful and inattentive. He also noted that Dr. Mukherjee had linked T.S.'s language-related problems to his reading impairments, and that subsequent speech/language evaluations performed by his school had shown no expressive language deficits. The ALJ found that Dr. Koenigsberg's psychiatric evaluation reports were "consistent with gradual improvement in [T.S.'s] academic functioning as well as a more-or-less continuous absence of behavioral or serious emotional issues, particularly after he was placed on Concerta, which resulted in significant improvement in his ADHD symptoms as well as other emotional issues . . . ." (AR 23.) He noted that T.S.'s anxiety and anger issues had decreased over time, and that his grade point average had notably increased from 66 to 75. The ALJ acknowledged that T.S. continued to struggle with English, and occasionally reported experiencing mild anxiety at school. Overall, however, the ALJ found that the treatment notes reflected a significant improvement in T.S.'s performance in school, exhibited through his increased attention span and the completion of assignments in a timely manner.

**IV.     Analysis**

    **A.     Substantial Evidence**

       **1.     ADHD**

The Listing requirements for ADHD are met if the claimant shows medically documented findings of (i) marked inattention; and (ii) marked impulsiveness; and (iii) marked hyperactivity. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.11. Additionally, the claimant must show that his impairment results in at least two of the following: (i) marked impairment in age-appropriate cognitive/communicative function; (ii) marked impairment in age-appropriate social functioning; (iii) marked impairment in age-appropriate personal functioning; or (iv) marked difficulties in maintaining concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.02(B)(2).

There is substantial evidence to support the ALJ's conclusion that T.S. was not disabled. Both Dr. Randall and Dr. Brust, in her initial report, found that T.S. did not meet the Listing requirements for ADHD. Although Dr. Brust testified at the ALJ hearing that T.S.'s impairments "borderline" met or medically equaled the Listing for ADHD, when pressed by the ALJ, Dr. Brust stated that with medication and appropriate schooling, his symptoms did not meet the Listing requirements. She also admitted that she was not able to testify with certainty as to whether there was a 12-month period after November 6, 2012, when he met or medically equaled the Listing. Furthermore, Dr. Brust testified that there was "no way" his limitations in the domains of acquiring and using information and attending and completing tasks qualified as marked because his processing speed impairment did not "affect[] him that much." (AR 61.)

The ALJ's conclusion is further supported by Dr. Kushner's findings, to which the ALJ assigned partial weight. Dr. Kushner concluded that T.S.'s examination was consistent with

29

cognitive problems secondary to attention deficit disorder. He found, however, that these problems were not "significant enough" to interfere with T.S.'s ability to function on a daily basis. (AR 231.) This conclusion supports the ALJ's conclusion that T.S. did not have a "marked impairment in age-appropriate cognitive/communicative function," as required by the Listings. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.02(B)(2).

Treatment notes from T.S.'s psychiatrists at St. Luke's Hospital also support a finding that T.S.'s symptoms greatly improved over time and, therefore, did not satisfy the Listing criteria. In January 2013, Dr. Koenigsberg reported that T.S.'s sensory abilities, emotional, and communication skills were age-appropriate. Although he found that T.S.'s cognitive skills had not yet reached the age-appropriate level, his focus and concentration had improved with regular use of Concerta. In July 2013, Dr. O'Hagan noted only "some mild impairment on attention and concentration testing," but otherwise found that T.S. exhibited age-appropriate behavior and an intact memory. (AR 380.) In November 2013, Brown told Dr. O'Hagan that T.S. was well-behaved at both home and school. He increased T.S.'s dosage of Concerta, and in December 2013, both T.S. and Brown reported increased focus and ability to complete homework.

Improvement in T.S.'s behavior and academic performance also are reflected in Mr. Gotay's treatment notes. In May 2013, Brown told Mr. Gotay that T.S. was doing better in school and earning grades in the 70s. In October 2013, both Brown and T.S. reported good behavior at school, improved attention span, and a fair adjustment to the eighth grade. In March 2014, T.S. showed Mr. Gotay his report card, which showed that his overall average had increased from 66 to 75.

Because both medical and non-medical evidence support the ALJ's finding that T.S.'s ADHD symptoms did not persist for a twelve-month period at the level of severity required by

the Listings, there was substantial evidence to support the ALJ's finding that T.S.'s impairment

does not meet or medically equal the Listings requirements for ADHD.

### 2. Anxiety

In order to satisfy the Listing requirements for an anxiety disorder, the claimant must

present medically documented findings of at least one of the following:

1. Excessive anxiety manifested when the child is separated, or separation is threatened, from a parent or parent surrogate; or

2. Excessive and persistent avoidance of strangers; or

3. Persistent unrealistic or excessive anxiety and worry (apprehensive expectation), accompanied by motor tension, autonomic hyperactivity, or vigilance and scanning; or

4. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

5. Recurrent severe panic attacks, manifested by a sudden unpredictable onset of intense apprehension, fear, or terror, often with a sense of impending doom, occurring on the average of at least once a week; or

6. Recurrent obsessions or compulsions which are a source of marked distress; or

7. Recurrent and intrusive recollections of a traumatic experience, including dreams, which are a source of marked stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.06.

Additionally, the claimant must present evidence showing that his impairment results in at least

two of the following: (i) marked impairment in age-appropriate cognitive/communicative

function; (ii) marked impairment in age-appropriate social functioning; (iii) marked impairment

in age-appropriate personal functioning; or (iv) marked difficulties in maintaining concentration,

persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.02(B)(2).

There is substantial evidence to support the ALJ's finding that T.S.'s anxiety symptoms do not meet the criteria set forth in the Listings. There is no evidence that T.S. experienced any of the symptoms described in Section 112.06 of the Listings, or that his occasional anxiety caused him to experience marked impairment in his cognitive/communicative or social functioning, or experience marked difficulties in maintaining concentration, persistence, or pace. Dr. Mukherjee did not observe any anxiety or mood symptoms in the June 2012 neuropsychological exam. She noted, however, that many individuals with ADHD – inattentive type, were likely to experience "internalizing symptoms," like depression and anxiety, due to an awareness of their slower processing speed in comparison with their peers. (AR 214.) There is no evidence that Dr. Koenigsberg or Dr. O'Hagan, T.S.'s treating psychiatrists, ever diagnosed him with anxiety or any other mood disorder. When Dr. O'Hagan tested T.S. for anxiety disorders in November 2013, the results were negative. Although T.S. occasionally reported elevated anxiety levels to his therapists, it appears that Mr. Gotay's recommended coping mechanisms were sufficient to help T.S. to identify the source of his anxiety and deal with it on his own.

Dr. Brust was the only expert to opine that T.S. might qualify for the Listing requirements for an anxiety disorder. The ALJ properly gave her opinion partial weight because it conflicted with the opinions expressed by the other consulting experts, as well as the treatment notes from T.S.'s treating physicians. Additionally, Dr. Brust did not include a Listing disorder of anxiety in her initial report.

Because there is no additional evidence on the record consistent with the Listing's requirements of an anxiety disorder, the ALJ's decision was supported by substantial evidence.

### 3.   The Six Domains of Functioning

After determining that T.S.'s impairment did not meet or medically equal a Listings impairment, the ALJ proceeded to consider whether T.S.'s impairments functionally equaled a Listing. In assessing a claimant's functional limitations, the ALJ must consider (i) how well the child can initiate and sustain activities, how much extra help he needs, and the effects of a structured or supportive setting; (ii) how well the child functions at school; and (iii) the effects of any medications or other treatment. See 20 C.F.R. § 416.926a(a)(1)–(3). If the claimant's symptoms are reduced by medication, the ALJ should further consider any functional limitations that nevertheless persist, any side effects from the medications, the frequency of the claimant's need for medication, changes in the medication or dosage, and any evidence over time of how the medication helps the claimant to function compared to other children of his age who do not have impairments. See 20 C.F.R. § 416.924a(b)(9).

### a.     Acquiring and Using Information

In the domain of acquiring and using information, the ALJ considers how well the claimant acquires or learns information, and how well the claimant uses the information he has learned.  See 20 C.F.R. § 416.926a(g). Adolescents ages 12 to 18 should be able to demonstrate what they have learned in academic assignments, such as classroom discussions and written assignments, and use what they have learned in daily living situations. See 20 C.F.R. § 416.926a(g)(2)(v). They should also be able to comprehend and express simple and complex ideas, using increasingly complex language in learning and daily living situations. Id.

The ALJ properly relied on Dr. Brust's conclusion that T.S. had a less than marked limitation in this domain. Although the record indicates that T.S. has difficulty with reading comprehension and recalling details from lessons or stories, Dr. Brust testified that there was "no

33

way" that T.S.'s limitations in acquiring and using information could be described as "marked." In the 2012 neuropsychological evaluation, Dr. Mukherjee identified T.S.'s slow working/reading speed as his main cognitive difficulty. This conclusion was supported by his teachers' statements that T.S. processed information slowly and often had difficulty retrieving information on the spot or discussing newly acquired information in class. In a psychoeducational evaluation from May 2012, the evaluator noted that T.S.'s attention problems, paired with relatively weak verbal abilities, language development and vocabulary, likely accounted for his trouble with reading and writing. The evaluator suggested that T.S.'s impairment could be improved if he read more age-appropriate books to strengthen his vocabulary and reading comprehension skills. Additionally, Dr. Kushner found that T.S. could "learn in accordance to cognitive functioning, although his attention problems may inhibit him in this realm at times." (AR 231.)

Moreover, after starting therapy and a course of Concerta, T.S. was able to improve his grades significantly in all subject areas except ELA. His teachers reported that he was able to focus and concentrate better in class, and he was accepted to Urban Technology High School.

Taken together, there is substantial evidence in the record to support the ALJ's finding that T.S. had a less than marked limitation in the domain of acquiring and using information.

### b. Attending and Completing Tasks

In the domain of attending and completing tasks, the ALJ examines how well the claimant is able to focus and maintain attention, and how well the claimant begins, carries through and finishes activities, including the pace at which the claimant performs activities and the ease with which he changes them. See 20 C.F.R. § 416.926a(h). Limitations that an ALJ may consider that fall under this domain include: the claimant is slow to focus on, or fails to

complete, activities that interest him; the claimant repeatedly becomes sidetracked from his activities or frequently interrupts others; the claimant is easily frustrated and gives up tasks; and the claimant requires extra supervision to keep him engaged in an activity. See 20 C.F.R. § 416.926a(h)(3)(ii)–(v).

Here, too, there is substantial evidence to support the ALJ's conclusion that T.S. had a "less than marked" limitation in the domain of attending and completing tasks. This conclusion was supported by the findings of Drs. Brust and Randall, who both concluded that T.S. had "less than marked" limitations in this domain. The ALJ acknowledged that, before taking Concerta, T.S. experienced problems with attention and focus. He also assigned partial weight to Dr. Kushner's finding that T.S.'s attention problems might somewhat impair his abilities to attend to, follow and understand age-appropriate instructions.

After beginning treatment with Concerta, however, T.S.'s abilities to focus and maintain attention increased over time. Treatment notes with his doctors and therapists at St. Luke's confirm that the Concerta greatly improved his ability to focus and concentrate at school. His teachers also reported that he became "much more focused" after starting Concerta, and his mother reported that he was no longer exhibiting behavioral problems at home. There is therefore substantial evidence to support the ALJ's finding that T.S. did not have a "marked" or "extreme" limitation in the domain of attending and completing tasks.

### c.  Interacting and Relating with Others

In this domain, the ALJ considers how well the claimant initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. See 20 C.F.R. § 416.926a(i). By the time that a child reaches adolescence, he should be

35

able to initiate and develop friendships with children his own age and relate appropriately to other children and adults. He should also be able to resolve conflicts between himself and his peers or family members, and recognize that a different set of rules applies for the child and his friends and for acquaintances and adults. Adolescents should be able to express intelligibly their feelings, asks for assistance, seek information, describe events and tell stories in all kinds of environments and with all types of people. See 20 C.F.R. § 416.926a(i)(2)(v).

The ALJ properly concluded that T.S. has no functional limitations in this domain. Although Brown reported that T.S. occasionally had issues expressing his anger, treatment notes from Mr. Gotay show that T.S. was aware of his emotional issues and that he actively worked with his therapist and mother to improve his anger management abilities. Although there are a few records indicating that T.S. occasionally had behavioral issues at school, such as acting up or talking during class, his teachers noted that his behavior improved and he became "less challenging" once he started Concerta.

The ALJ's conclusion is further supported by Dr. Brust's finding that T.S. had no limitations in this domain. Likewise, Dr. Koenigsberg wrote in his treatment notes that T.S. had normal communications skills and social/emotional skills. Dr. O'Hagan observed that T.S. was "pleasant, well related" and exhibited "age appropriate behavior," (AR 380.), and Dr. Kushner found that T.S.'s manner of relating and social skills were age appropriate. These medical findings belie Dr. Randall's finding that T.S. had "less than marked limitations" in this domain.

There is therefore substantial evidence to support the ALJ's finding that T.S. had no limitations in the domain of interacting and relating with others.

36

#### d.  Moving About and Manipulating Objects

Under this domain, the ALJ considers how well the claimant moves his body from one place to another and how the claimant moves and manipulates things. See 20 C.F.R. § 416.926a(j). There was substantial evidence to support the ALJ's conclusion that T.S. had no limitations in this domain of functioning. Drs. Brust and Randall both agreed that he had no limitations, and at the ALJ hearing, T.S. testified that he enjoyed playing football, basketball and video games with his friends. Furthermore, there is no medical evidence in the record to support a finding of any limitations in this domain.

#### e.  Caring for Oneself

In this domain, the ALJ considers how well the claimant maintains a healthy emotional and physical state, including how well the claimant gets his physical and emotional wants and needs met in appropriate ways, how he copes with stress and changes in his environment, and whether he can take care of his own health, possessions and living area. See 20 C.F.R. § 416.926a(k). In this domain, too, the ALJ properly found that T.S. has no functional limitations. This conclusion was supported by the findings of Drs. Brust and Randall. Dr. Kushner noted in his report that T.S. could respond appropriately to changes in his environment. Brown also admitted that she had not noticed any problems with T.S.'s ability to engage in self-care activities. There was therefore substantial evidence to support the ALJ's finding that T.S. had no limitations in this domain.

#### f.  Health and Physical Well-Being

Finally, in the domain of health and physical well-being, the ALJ will consider the cumulative effects of physical or mental impairments and their associated treatments or therapies on the claimant's functioning, which were not considered under the domain of moving about and

manipulating objects. See 20 C.F.R. § 416.926a(l). Examples of limitations in health and physical well-being include: generalized symptoms such as weakness, dizziness, or lethargy caused by the claimant's impairments; somatic complaints related to the claimant's impairments; limitations on physical functioning because of treatment; exacerbations from one impairment or a combination of impairments that interfere with a claimant's physical functioning. See 20 C.F.R. § 416.926a(l)(4).

The ALJ properly relied on Dr. Brust's conclusion that T.S. had a less than marked limitation in this domain. The ALJ noted in his decision that T.S.'s teachers reported that he was "responding positively" to his medication and exhibited a "lighter" mood and better response to challenges. Although Brown occasionally expressed concerns to his psychiatrists that T.S. experienced anxiety over school, Dr. O'Hagan concluded that T.S. did not have an anxiety disorder. T.S. generally reported anxiety levels between zero and six to Mr. Gotay, who helped him to develop coping mechanisms. There is no evidence in the record of other physical or mental health symptoms, or indications that T.S. experienced any other physical ailments. Accordingly, the ALJ's conclusion that T.S. had less than marked limitations in this domain is supported by substantial evidence.

**B.    Credibility Determination**

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of his impairment. Tejada v. Apfel, 167 F.3d 770, 775–76 (2d Cir. 1999). See also 20 C.F.R. § 416.929(b) (dictating than an individual's subjective complaints alone do not constitute conclusive evidence of a disability). In making a credibility determination, if a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ should "consider all available evidence," including the

claimant's daily activities, the location, nature, extent, and duration of his symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken to relieve symptoms. Cichocki v. Astrue, 534 F. App'x 71, 75–76 (2d Cir. 2013) ("Cichocki II") (citing 20 C.F.R. §§ 416.929(c)(2), 416.929(c)(3)). If the ALJ rejects the claimant's testimony after considering the objective medical evidence, then he must provide a basis for his conclusion "with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 435–36 (S.D.N.Y. 2010).

The ALJ wrote that Brown's statements concerning the intensity, persistence and limiting effects of T.S.'s impairments and symptoms were not supported by objective evidence and therefore not credible in establishing that T.S. is disabled under the applicable guidelines. Although he failed to provide a discussion of specific factors considered in his credibility analysis, such error was harmless because the record as a whole contains substantial evidence supporting the ALJ's negative credibility determination.  As discussed above, both of T.S.'s treating physicians noted improvements in his focus and concentration after he began taking Concerta. Brown and T.S. told his therapist that his grades were gradually improving, and in 2014, T.S. received passing marks in most subjects and was accepted to high school. The ALJ noted that T.S. told Dr. Kushner that his medication helped his attention and hyperactivity symptoms, but did not eliminate them completely. He also noted that Brown told Dr. Kushner that she thought T.S. was more anxious than her other children, but that T.S. denied experiencing any symptoms of depression or anxiety. Although T.S. occasionally reported elevate feelings of anxiety to Mr. Gotay, his mother's concerns about an anxiety disorder were controverted by Dr.

O'Hagan's findings. In light of the abundance of evidence indicating that T.S.'s ADHD symptoms improved over the course of his treatment, there is substantial evidence to support the ALJ's credibility finding.

### CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is GRANTED and the plaintiff's claims are dismissed with prejudice.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            May 27, 2016


cc:         Winona Brown (*by Chambers*)
            271 W. 150th Street
            Apt. 3A
            New York, NY 10039